**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

**RANDY ALLEN SNYDER,**

       **Plaintiff,**

    **v.**                               **Civil Action 2:16-cv-691**
                                              **Chief Judge Edmund A. Sargus, Jr.**
                                              **Magistrate Judge Jolson**

**COMMISSIONER OF SOCIAL**
**SECURITY,**

         **Defendant.**

## <u>REPORT AND RECOMMENDATION</u>

Plaintiff, Randy Allen Snyder, filed this action seeking review of a decision of the Commissioner of Social Security ("Commissioner") denying both his Title II Disability Insurance Benefits and Title XVI Supplemental Security Income Disability applications. For the reasons that follow, it is **RECOMMENDED** that Plaintiff's Statement of Errors be **OVERRULED**, and that judgment be entered in favor of Defendant.

## I.    BACKGROUND

### A.  Prior Proceedings

Plaintiff filed for disability insurance benefits ("DIB") on August 20, 2012, and filed for supplemental security income ("SSI") on July 23, 2013. (Doc. 10, Tr. 125, 134 PAGEID #: 166, 175). In both applications, Plaintiff alleged a disability onset date of February 18, 2011. (*Id.*). His claims were denied initially on March 14, 2013 (*Id.*, Tr. 82–83, PAGEID #: 123–24), and upon reconsideration on May 7, 2013 (*id.*, Tr. 92, PAGEID #: 133). Administrative Law Judge Patricia Witkowski Supergan (the "ALJ") held a hearing by video teleconference on December 5, 2014 (*id.*, Tr. 28, PAGEID #: 69), after which she entered a partially favorable decision on February 27, 2015, finding Plaintiff was disabled beginning on April 20, 2014, but

not before (*id.*, Tr. 22, PAGEID #: 63).  Plaintiff sought review of the unfavorable portion of the ALJ's decision, but the decision became final when the Appeals Council denied review on May 18, 2016.  (*Id.*, Tr. 1, PAGEID #: 42).

Plaintiff filed this case on July 15, 2016 (Doc. 1), and the Commissioner filed the administrative record on September 30, 2016 (Doc. 10).  Plaintiff filed a Statement of Specific Errors on November 28, 2016 (Doc. 13), the Commissioner responded on January 11, 2017, (Doc. 14), and no Reply was filed.

## B.  Relevant Testimony at the Administrative Hearing

### 1. Plaintiff's Testimony

At the hearing, Plaintiff explained that he last worked in February 2011 because his employer went out of business, not because of any physical impairment.  (Doc. 10, Tr. 32, PAGEID #: 73).  Plaintiff testified that, after he lost his job, he looked for jobs in retail, fast food, parts delivery, auto part stores, grocery stores, and janitorial positions, but had no success, and began receiving unemployment benefits.  (*Id.*, Tr. 37–38, PAGEID #: 78–79).

Concerning his impairments, Plaintiff testified that he has problems with his shoulders, neck, hands, and lower back.  (*Id.*, Tr. 38–40, PAGEID #: 79–81).  Specifically, Plaintiff stated his shoulders make it difficult to work over his head, bend over, and shovel (*id.*, Tr. 38, PAGEID #: 79); his hands make it difficult to pick things up, play with puzzles, and it's painful to squeeze something together (*id.*, Tr. 40, PAGEID #: 81); and his back problems make it difficult to sit and drive (*id.*, Tr. 41, PAGEID #: 82).  Plaintiff also explained that he used to have over $100,000 worth of tools but had to sell them because he was unable to lift them or use them properly because "[i]t's just too painful in [his] hands and [] shoulders."  (*Id.*, 40, PAGEID #:

81).

In terms of his daily activities, Plaintiff testified that he lives in the country, about nine miles from town, with thirteen cows, one dog, and one cat. (*Id.*, Tr. 33, PAGEID #: 74). Plaintiff stated his son and wife take care of the animals, whereas he "just watch[es] them out the window." (*Id.*). Plaintiff has a driver's license and is able to drive to and from town when he needs groceries, has doctor appointments, or wants to go to his son's football practices or games. (*Id.*, Tr. 33–34, PAGEID #: 74–75). Plaintiff testified further that he smokes two packs a day, rolls his own cigarettes, and doesn't have any difficulty holding them. (*Id.*, Tr. 35, PAGEID #: 76). He also drinks three to four beers a night, and often consumes a thirty-pack of beer a week, but denied any current drug use. (*Id.*, Tr. 36, 42, PAGEID #: 77, 583).

### 2. Dr. Ashok Jilhewar's Testimony

Dr. Jilhewar testified that Plaintiff's only severe impairment as of the alleged onset date, February 17, 2011, was generalized osteoarthritis in the shoulders. (*Id.*, Tr. 43, PAGEID #: 84). When asked by the ALJ if he believed any of Plaintiff's alleged impairments met or equaled any listings, Dr. Jilhewar stated he believed Plaintiff met Listing 1.02(B). (*Id.*, Tr. 46, PAGEID #: 84). However, when the ALJ asked Dr. Jilhewar "as of what date" Plaintiff met the Listing, he responded "that is a problem, your honor." (*Id.*). Dr. Jilhewar elaborated that the first time that documentation supported the fact that Plaintiff met a Listing was on July 30, 2013, when x-rays taken on Plaintiff's hands and shoulders should significant deterioration. (*Id.*, Tr. 47, PAGEID #: 88).

As to Plaintiff's residual functional capacity ("RFC") between February 18, 2011 and July 30, 2014, Dr. Jilhewar opined that Plaintiff was limited to sedentary work, due to Plaintiff's

chronic pain in his back and neck, "with the additional limitations related to the shoulders of occasional overhead reaching bilaterally." (*Id.*).

### C. Relevant Medical Background

On January 21, 2011, Plaintiff presented to Dr. Edwin Hissa with complaints of a right shoulder injury, although he noted pain in his left shoulder as well. (Doc. 10, Tr. 237–38, PAGEID #: 278–79). Dr. Hissa diagnosed Plaintiff with what he believed was a biceps tendon tear, impingement of the rotator cuff, and impending bicipital tendonitis on the left side. (*Id.*).

On November 7, 2011, Plaintiff underwent a total shoulder replacement with Dr. Brian Cohen. (*Id.*, Tr. 262, PAGEID #: 303). It was noted that Plaintiff "tolerated the procedure well and was transferred to recover in stable condition." (*Id.*). At a follow-up appointment on February 28, 2012, Dr. Cohen noted Plaintiff had "good motion and good strength," (*id.*, Tr. 296, PAGEID #: 337), and he was reportedly "doing great" at his June 26, 2012 appointment. (*Id.*, Tr. 295, PAGEID #: 336).

On August 24, 2012, Plaintiff saw Dr. Anthony Lattavo for left shoulder pain. (*Id.*, Tr. 272, PAGEID #: 313). Imaging studies revealed Plaintiff had a longitudinal split tear of the biceps tendon, a partial tear of the subscapularis tendon at the humeral attachment, a longitudinal interstitial tear in the supraspinatus tendon, a suspected labral tear, and a possible partial tear of the anterior band of the inferior glenohumeral ligament. (*Id.*, Tr. 254–55, PAGEID #: 295–96).

Plaintiff followed up with Dr. Cohen on November 16, 2012, who recommended shoulder arthroscopy labral repair, subacromial decompression, distal clavicle resection, rotator cuff repair, and open biceps tenodesis. (*Id.*, Tr. 251–52, PAGEID #: 292–93). Plaintiff underwent a left should surgery on November 29, 2012. (*Id.*, Tr. 257, PAGEID #: 298). During

a postoperative follow-up with Dr. Cohen on December 4, 2012, it was noted that Plaintiff's "[i]ncisions were clean, dry and intact . . . Restrictions were outlined and all questions were answered." (*Id.*, Tr. 250, PAGEID #: 291). On December 26, 2012, Plaintiff saw Dr. Cohen again for continuing right shoulder pain. (*Id.*, Tr. 293, PAGEID #: 334). Treatment notes from the appointment indicate that Plaintiff is "doing better," although he "[s]till has some soreness but has not been wearing his sling." (*Id.*). At another follow-up on January 30, 2013, Dr. Cohen reported that Plaintiff was doing well and was expected "to advance with PT." (*Id.*, Tr. 291, PAGEID #: 332).

On July 26, 2013, Plaintiff saw Dr. Anthony Lattavo for "[s]udden onset left shoulder pain" that came about while operating a drill press. (*Id.*, Tr. 289, PAGEID #: 330). X-rays showed a downsloping acromion and there was a "suggestion of slight superior migration of the humeral head," but no fracture. (*Id.*, Tr. 290, 488, PAGEID #: 331, 529). At a follow-up appointment on August 16, 2013, Dr. Lattavo noted Plaintiff still had left shoulder pain, as well as "some limitations with use of the shoulder," including active abduction, external rotation, and reaching into adduction. (*Id.*, Tr. 490–91, PAGEID #: 521–22).

On July 30, 2014, x-rays of Plaintiff's hands showed "[s]evere hypertrophic degenerative changes in the first interphalangeal joint space with mild subluxation" and it was noted the changes had progressed compared to a prior study on March 10, 2009. (*Id.*, Tr. 420, PAGEID #: 461). X-rays of Plaintiff's left shoulder on the same date showed mild degenerative changes in the acromioclavicular joint and postsurgical changes in the proximal humerus. (*Id.*).

### D. State Agency Assessments

State Agency consultant Dr. Anahi Ortiz opined on March 13, 2013, that Plaintiff had

some exertional limitations, but could occasionally lift and/or carry 20 pounds, frequently lift and/or carry 10 pounds, stand for 6 hours, and sit for 6 hours. (Doc. 10, Tr. 58–59, PAGEID #: 99–100). Additionally, Dr. Ortiz found that Plaintiff could never crawl or climb ladders, ropes, or scaffolds, could occasionally stoop, kneel, and climb ramps/stairs, and was able to crouch frequently. (*Id.*, Tr. 59, PAGEID #: 100).

On April 26, 2013, Dr. Maureen Gallagher reached the same conclusion as Dr. Ortiz in terms of Plaintiff's exertional limitations. (*Id.*, Tr. 71, PAGEID #: 112). Dr. Gallagher's postural findings were different from Dr. Ortiz only in that she found Plaintiff could kneel frequently, as opposed to occasionally. (*Id.*, Tr. 72, PAGEID #: 113).

### E. The ALJ's Decision

The ALJ found that since the alleged onset date of disability, Plaintiff has suffered from a history of right shoulder arthroplasty with degenerative joint disease of the shoulder bilaterally that qualifies as "severe." (Doc. 10, Tr. 14, PAGEID #: 55). The ALJ also addressed Plaintiff's non-severe impairment of alcohol abuse, but found it did not cause more than a minimal limitation in Plaintiff's ability to perform basic mental activities. (*Id.*).

Further, the ALJ held that prior to April 20, 2014, Plaintiff did not have an impairment or combination of impairments that met or equaled a listed impairment. (*Id.*, Tr. 15, PAGEID #: 56). Specifically, the ALJ noted that Plaintiff "certainly had a history of shoulder dysfunction leading up to the time of disability, but it was not until July 30, 2014 that records establish listing level severity." (*Id.*). As to Plaintiff's RFC prior to April 20, 2014, the ALJ stated:

> [T]he claimant had the residual functional capacity to perform light work as defined by the Regulations. He could frequently climb ramps and stairs, but never ladders, ropes or scaffolds' and frequently balance, stoop, kneel, crouch, and crawl. The claimant could frequently reach in all directions including

overhead with both upper extremities and frequently handle, finger, and constantly feel with both upper extremities. The claimant could tolerate occasional exposure to and work around extreme cold and heat, wetness, humidity, vibration, and hazards such as moving machinery and unprotected heights.

(*Id.*, Tr. 15–16, PAGEID #: 56–57). In making this determination, the ALJ stated she had considered all symptoms and the extent to which these symptoms could reasonably be accepted as consistent with the objective medical evidence and other evidence, as well as opinion evidence. (*Id.*, Tr. 16, PAGEID #: 57).

The ALJ also found that Plaintiff's statements about the intensity, persistence, and limiting effects of his symptoms were not entirely credible prior to April 20, 2014, and listed various inconsistencies in Plaintiff's testimony regarding his daily activities and the physical limitations he alleged. (*Id.*, Tr. 17–18, PAGEID #: 58–59). While evaluating Plaintiff's credibility as it related to his assertions, the ALJ took into consideration various factors, "including the objective medical evidence, statements relating to alleged pain, medical treatment, medications taken, and any opinion evidence." (*Id.*, Tr. 19–20, PAGEID #: 60–61). Specifically, the ALJ noted various inconsistencies in Plaintiff's testimony and evidence in the record.

For example, Plaintiff originally alleged that he stopped working because of his impairments, but later revised this statement and "admitted that his past employment as a heavy machinery repairer was terminated not due to any disabling issues, and he subsequently collected unemployment benefits while simultaneously alleging disability." (*Id.*, Tr. 16, PAGEID #: 57). Additionally, the ALJ noted that Plaintiff stated he could no longer use his tools, yet in his Function Report he admitted "to retained physical abilities such that he continues to help around

the house, including doing laundry and helping his son with school work." (*Id.*). In yet another example, the ALJ noted that Plaintiff claimed to have trouble sitting, yet he also "admitted to sitting for hours to watch his son play football and he enjoys fishing in his free summertime hours." (*Id.*, Tr. 17, PAGEID #: 58).

Accordingly, when taking these factors into account, and in considering Plaintiff's age, education work experience, and RFC, the ALJ found that there were jobs that existed in significant numbers in the national economy that Plaintiff could have performed prior to April 20, 2014. (*Id.*, Tr. 21, PAGEID #: 62). The ALJ did find, however, that Plaintiff became disabled on April 20, 2014, and has continued to be disabled since that date. (*Id.*, Tr. 22, PAGEID #: 63). Specifically, the ALJ noted that x-ray findings from July 30, 2014 showed "significant deterioration in his hands and shoulders." (*Id.*, Tr. 19, 22, PAGEID #: 60, 63). These degenerative findings of Plaintiff's left shoulder and hands, according to the ALJ, "satisfied the requirements of Listing 1.02 as of July 30, 2014." (*Id.*, Tr. 22, PAGEID #: 63).

## II.    STANDARD OF REVIEW

The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App'x 315, 320 (6th Cir. 2015); *see* 42 U.S.C. § 405(g). "[S]ubstantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of HHS*, 25 F.3d 284, 286 (6th Cir. 1994)). "Therefore, if substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is

substantial evidence in the record that would have supported an opposite conclusion.'" *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009) (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)).

## III.    DISCUSSION

In his Statement of Specific Errors, Plaintiff alleges the ALJ's RFC finding for the period of February 18, 2011 to April 20, 2014, was not supported by substantial evidence. (Doc. 13 at 9). Specifically, Plaintiff contends that the ALJ committed reversible error in that she failed to discuss, or give a reason as to why she ignored the opinion of medical expert Dr. Ashok Jilhewar in making her RFC finding. (*Id.*).

A plaintiff's RFC "is defined as the most a [plaintiff] can still do despite the physical and mental limitations resulting from her impairments." *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 155 (6th Cir. 2009); *see also* 20 C.F.R. §§ 404.1545(a), 416.945(a). The Social Security regulations, rulings, and Sixth Circuit precedent provide that the ALJ is charged with the final responsibility in determining a claimant's residual functional capacity. *See e.g.*, 20 C.F.R. § 404.1527(d)(2) (the final responsibility for deciding the residual functional capacity "is reserved to the Commissioner"). Nevertheless, substantial evidence must support the Commissioner's RFC finding. *Berry v. Astrue*, No. 1:09CV000411, 2010 WL 3730983, at *8 (S.D. Ohio June 18, 2010). To assist in RFC determinations, the Commissioner considers physical exertional requirements and "classif[ies] jobs as sedentary, light, medium, heavy, and very heavy." 20 C.F.R. §§ 404.167, 416.967. The regulations describe light work:

> Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and

pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities.

20 C.F.R. §§ 404.167(b), 416.967(b) (emphasis added). The ALJ, not a physician, ultimately determines a claimant's RFC. 42 U.S.C. § 423(d)(5)(B); *see also Nejat v. Comm'r of Soc. Sec.*, 359 F. App'x 574, 578 (6th Cir. 2009). And it is the ALJ who resolves conflicts in the medical evidence. *King v. Heckler*, 742 F.2d 968, 974 (6th Cir. 1984). In doing so, the ALJ is charged with evaluating several factors in determining the RFC, including the medical evidence (not limited to medical opinion testimony), and the claimant's testimony. *Henderson v. Comm'r of Soc. Sec.*, No. 1:08-cv-2080, 2010 WL 750222, at *2 (N.D. Ohio March 2, 2010) (citing *Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 633 (6th Cir. 2004)).

Here, the ALJ's RFC was well supported by both medial evidence and Plaintiff's testimony. Notably, none of Plaintiff's treating physicians opined on any work limitations. In the absence of such limitations from a treating physician, the ALJ assigned "great weight" to the opinions of the two state agency consultants' opinions who did address Plaintiff's physical limitations, Drs. Ortiz and Gallagher. In fact, she incorporated almost identical postural and exertional limitations into Plaintiff's RFC as opined by the doctors, and explicitly stated their opinions were "relied upon in formulating the residual functional capacity." (*Id.*, Tr. 20, PAGEID #: 61; *id.*, Tr. 58–59, 71–72, PAGEID #: 99–100, 112–13). These opinions provided substantial evidence for the ALJ's determination that Plaintiff could perform light work.

Even still, Plaintiff contends the RFC is not supported by substantial evidence because Dr. Jilhewar opined that Plaintiff was restricted to sedentary work, and the ALJ ignored this opinion. Despite Plaintiff's contention, the ALJ clearly considered Dr. Jilhewar's opinion. The

ALJ explicitly discussed Dr. Jilhewar's testimony regarding Plaintiff's "generalized osteoarthritis" and relied heavily on his findings regarding when Plaintiff became disabled. (*Id.*, Tr. 22, PAGEID #: 63) ("As noted by the impartial medical expert, beginning on July 30, 2014, the severity of the claimant's impairment has medically equaled the criteria of section 1.02B."). Thus, although the ALJ did not explicitly discuss Dr. Jilhewar's limitation of Plaintiff to sedentary work, or the specific weight given to the opinion, it is clear she considered and evaluated his opinion.

Moreover, even Plaintiff acknowledges that it is "apparent from the ALJ's RFC finding that she gave no weight to Dr. Jilhewar's testimony" regarding Plaintiff's limitation prior to April 20, 2014. (Doc. 13 at 10). As noted above, it is the ALJ who resolves conflicts in the medical evidence, *see King*, 742 F.2d at 974, and here the ALJ resolved a conflict by relying heavily on the state agency consultants, rather than Dr. Jilhewar's sedentary work opinion. Accordingly, the ALJ's discussion and explanation regarding Plaintiff's RFC was sufficient. *See Woodcock v. Comm'r of Soc. Sec.*, 201 F. Supp. 3d 912, 921 (S.D. Ohio 2016) (holding that ALJs should "explain the weight given" to non-treating sources, "or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the [ALJ's] reasoning, when such opinions may have an effect on the outcome of the case.") (citing *Williamson v. Comm'r of Soc. Sec.*, No. 1:14–cv–731, 2016 WL 255033, at *8 (S.D. Ohio Jan. 20, 2016)).

The ALJ also considered Plaintiff's testimony in evaluating his RFC and found the testimony—and Plaintiff's allegations in general—to be not entirely credible. (*Id.*, Tr. 20, PAGEID #: 61). The Sixth Circuit has held that the Court must accord great deference to an

ALJ's credibility assessment, particularly because the ALJ has the opportunity to observe the demeanor of a witness while testifying. *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003). The ALJ stated expressly that there are a number of issues that call into question the credibility of Plaintiff's allegations. (*Id.*, Tr. 20, PAGEID #: 61). For example, Plaintiff indicated originally that he stopped working because he was no longer physically able to work, although it was later discovered he stopped working because the company went out of business. (*Id.*). Further, after he was laid off, "[h]e collected unemployment, which is seemingly inconsistent with an individual who alleges an inability to work." (*Id.*); *Workman v. Comm'r of Soc. Sec.*, 105 F. App'x 794, 801 (6th Cir. 2004) (holding that "[a]pplications for unemployment and disability benefits are inherently inconsistent.") (citing *Kinsella v. Schweiker,* 708 F.2d 1058, 1059 (6th Cir. 1983)). Finally, the ALJ pointed to other inconsistencies like the fact that Plaintiff claimed to have trouble sitting, yet he also "admitted to sitting for hours to watch his son play football and he enjoys fishing in his free summertime hours." (*Id.*, Tr. 17, PAGEID #: 58).

Accordingly, the "record as a whole" contains substantial evidence to support the ALJ's RFC decision. *See Berry*, 2010 WL 3730983, at *5.

## IV.    CONCLUSION

For the reasons stated, it is **RECOMMENDED** that Plaintiff's Statement of Errors (Doc. 13) be **OVERRULED** and that judgment be entered in favor of Defendant.

### Procedure on Objections

If any party objects to this Report and Recommendation, that party may, within fourteen (14) days of the date of this Report, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with

supporting authority for the objection(s). A judge of this Court shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made. Upon proper objections, a judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the magistrate judge with instructions. 28 U.S.C. § 636(b)(1). Failure to object to the Report and Recommendation will result in a waiver of the right to have the district judge review the Report and Recommendation *de novo*, and also operates as a waiver of the right to appeal the decision of the District Court adopting the Report and Recommendation. *See Thomas v. Arn*, 474 U.S. 140, 152–53 (1985).

      IT IS SO ORDERED.


Date: April 12, 2017                      /s/ Kimberly A. Jolson
                                         KIMBERLY A. JOLSON
                                         UNITED STATES MAGISTRATE JUDGE